We will move on to the next case, In Re. SSA Bonds Antitrust Litigation. Alright, I see everyone is on. Mr. Brockett? Thank you, Your Honor. May it please the Court, Dan Brockett from Quinn Emanuel on behalf of the plaintiff and panelists. This appeal presents one of the more detailed and factually supported complaints ever to be filed in an antitrust case in this district. This complaint has it all. Hundreds of smoking gun chats showing the traitors in their own words agreeing not to compete in various ways. Numerous plus factors. Sixteen statistical analyses demonstrating that the conspiracy affected the entire SSA bonds market during the class period, but not thereafter. And allegations of a pending government investigation that just three weeks ago resulted in a finding by the European Commission that the very conspiracy that we allege is not only plausible, but is in fact supported by substantial evidence. These allegations far surpass the plausibility threshold required for notice pleading. Now, against all this, there are, as the district court observed, specific allegations of collusion among a number of traitors, four traitors or so. What is the theory on holding, you know, 25 banks liable for, you know, a seven year conspiracy involving every transaction of these of these bonds? Okay, well, there's not really 25 banks. I mean, there are eight or nine banks. There are many of the defense are different affiliates of the various banks. But with respect to the entities that were named as defendants, that the London based traders were authorized and registered to trade on behalf of certain entities. Those entities are the are the foreign banks that have been named in the complaint. Okay, that's why they're identified because the traders were registered to trade on their behalf. Some of these entities, they also employ these traders and of course, control their activity. So we have the foreign banks are the ones that are employing the traders. The traders are registered on their behalf. And certain of the foreign banks were direct counterparties with the name plaintiffs on trades for SSA bonds. I mean, is is the argument that these that the foreign banks are responsible, regardless of whether anyone higher up, anyone above the traders had knowledge of what they were doing or intended that they engage in what they were doing? What's the theory for holding the banks themselves responsible for for this conspiracy? Because the banks employed the traders, and if the traders are engaging in collusion, and other activity to rig the market for these bonds, the banks are liable for the conduct of the traders. I mean, that's been the case in all of these financial market cases where the FX case, for example, or the GSA bonds case, or many of the other market manipulation cases that have settled the traders are engaged in the wrongdoing and their conduct is imputed to their employers. On whose behalf they traded. Let me ask you an example there. One of the smoking is guns. If we can say, yes, the example you cite involving I think if I'm pronouncing it right, Shailen Powell. Oh, I don't know how you pronounce it. But the EXPT 16 trade and the pleading states that at the time he was working for Credit Suisse. But that's shorthand, right, for four different companies. Yeah, but he was authorized to trade on behalf of four different Credit Suisse entities. But my point being, you said he worked for Credit Suisse. Yeah, he worked for them. So who did he work for? You didn't allege. I didn't see who his employer was. He's employed by one of the Credit Suisse entities. That's perfect. But which one? My point is, I don't know. I'm suing four of you. Because this trader worked for one of the four of you. And I'm not going to tell you which. No, but, but, but just work for it. Is it in the complaint? I guess is my question. Does your complaint allege who he worked for? I don't believe so. I don't believe we know what specific entity that he worked for. We know that he was registered to trade on behalf of numerous Credit Suisse entities. And when he did trade, he traded on behalf of all those entities. In this trade, in the XPT16. Yes. Did you allege on whose behalf he was trading? Trading on behalf of five different Credit Suisse entities. Simultaneously, that one trade? Yes, because he's authorized to act on their behalf. We, I mean, obviously, we don't know on whose behalf. Okay, well, that's a different question, right? You just said on all their behalves. But now you just said you don't know on whose behalf. And I guess those are two very different allegations. No, I would say that because he is registered to trade on behalf of four different Credit Suisse entities, right? The presumption here should be here that he, when he acts and when he's trading, he's trading on behalf of all the four on whose behalf he's authorized to trade. So let me get that straight. So you're arguing if someone is an agent for multiple people, whenever he acts, we must attribute his actions, all of his actions to all of his principles? I think it's fair to attribute his actions to the entities, the affiliates on that on whose behalf he was registered with the government authorities to trade. Every single time he ever acted as he was always simultaneously acting on behalf of all of them. Yes, registered to trade on their behalf. But look, I think the point is this. There are a number of affiliates of Credit Suisse in the complaint. Why are they in the complaint? Some of them traded with the name plaintiffs. Okay, some of them traded directly. Other affiliates are in the complaint because they employed the defendant. Others are in there because these traders were registered to trade on their behalf. Okay, that's why these entities are in the complaint. Okay, so, so yes, I do believe that the conduct of the traders is imputed to their employer and is imputed to those on whose behalf they act. Now, the defendants main argument here is an impossibility defense. They say that there was no central pricing mechanism. And therefore, it's impossible to believe that the traders could have chatted on every trade. Well, I say four things to this. First of all, these traders were in Bloomberg chat rooms and on the phone engaged in a running commentary in real time about their trading activity throughout the trading day. Secondly, these were thinly traded bonds where these desks were only doing a few dozen trades a day. So there's ample time to communicate with other traders with respect to the trades they were making. But the main point here is that our theory is not that the traders actually communicated on each trade. Our theory is that this agreement not to compete removed important competition from the marketplace. Indeed, the conspiracy converted as many as eight or nine dealers into a single dealer super desk. And when you remove 60 percent of the market from competition that can easily widen spreads across the entire market, even without the dealers fixing the price of every trade. And if I could just make one last point, this whole defense that the defense that the banks have articulated of impossibility was completely undercut, if not destroyed by the findings of the European Commission, which found that a core group of traders was able to affect the prices in the entire market, the European economic area. And they said the way they did it is that they agreed upon what spreads they would charge to the market on particular bonds. And so they could easily log into the chat room in the morning. We're going to quote this spread on this bond today. So they don't have to communicate with each other on every trade involving that bond because they've already agreed on what the spread they're going to quote is. So the European Commission findings do undercut the impossibility defense that the defendants have articulated here. I see my time's out. I'm happy to answer any questions the court has. I do have two minutes for rebuttal. Thank you. You have some rebuttal time, as you indicate. We'll hear from Ms. Lent. Thank you, Your Honor. May it please the court, Karen Lent, arguing behalf of the defendants' appellees with respect to the plausibility of the conspiracy and antitrust injury. Plaintiffs allege an impossibly vast conspiracy. 30-plus bank entities, some domestic, some foreign, working as a unitary superdesk all day, every day for seven years, to artificially widen bid-ask spreads of every U.S. dollar-denominated SSA bond sold on the secondary market. This is nothing like the alleged price-fixing conspiracies that this court or others have held are plausible or in which the plaintiffs have adequately alleged antitrust injury. For example, plaintiffs don't allege that defendants fixed a benchmark rate or a component price of any SSA bond, nor do they allege that the price of any one SSA bond has any relationship to the price of any other SSA bond. Plaintiffs don't allege that defendants account for a high market share of SSA bond transactions, such that their individual transactions could have market-wide effects. And they don't even allege that plaintiffs engaged in parallel conduct. This conspiracy is not the same as what the EC fined four banks for, as plaintiff's attorney said. Those EC fines were limited to four banks for a brief period of time, a limited period of time, and alleged effects in the European economic area, not in the United States. Excuse me, counsel, but we're dealing with dollar-denominated bonds, so it's fair to assume that it's adequately pleaded that what was done in Europe had an impact in the United States, because it's largely Americans who buy dollar-denominated bonds. Is that not true? Well, the conspiracy that plaintiffs have alleged is much different than the conspiracy that, presumably, the European Commission found by those banks. Why don't we let the European Commission worry about their business? I hear you saying that it's implausible that what is alleged covers every bond sold over a period of years all over the place. But is it not adequately pleaded that these agents of at least a number of banks conferred on what kind of quotes to make and to retreat and back off making proposals or quotes with respect to certain bonds? And maybe it's four banks instead of eight. But are you saying that there's no antitrust conspiracy that's alleged in this complaint? The antitrust conspiracy that's alleged in this complaint is a seven-year, 35-entry-wide conspiracy to fix the bid-ask spreads of every SSA bond transaction that these defendants engaged in. It is not limited to four defendants. Wouldn't the district court have had the right to say, dismiss some defendants and say, well, it's adequately pledged to some defendants and not as to others? I mean, I don't know that the conspiracy rises or falls on whether it is 100% well-pledged to everyone, right? I mean, you could have proof that one bank didn't participate. You could drop them. That wouldn't mean that there's no conspiracy among the rest, right? Well, given the nature of the marketplace in which SSA bonds are traded, the fewer of these defendants that are alleged to have participated in the conspiracy, the less plausible the conspiracy becomes. We're talking about bonds that are traded in one-off transactions, bilateral transactions. The trades happen in a matter of minutes. They happen very quickly. And there's no reason to assume that there were market-wide effects from this kind of a conspiracy. What if you limited it to the entities that employed the traders in question for whom we have these chats and these transcripts of conversations? Why wouldn't that be a plausible conspiracy? We have the same problem. Because of the nature of the trading in this marketplace, it's implausible that those traders would have affected the prices of all of the SSA bond transactions that they engaged in. There are many other non-defendant traders who are also trading in SSA bonds and are not alleged to have colluded in any of these transactions. So it's impossible to say whether the parties that purchased bonds from those particular defendants didn't go to some other non-defendant dealer to get a quote, and there would be no harm in that transaction. So it sounds like there might be something as to those entities and traders, but it wouldn't be this broad antitrust conspiracy that the plaintiffs are alleging. Is that the argument? There might be, but the plaintiffs have had a number of chances to plead their complaint. The complaint was dismissed once before, and they were instructed that there was no antitrust injuries shown in this complaint. They came back with the same vast conspiracy. So that's the conspiracy that they're sticking with, and that conspiracy requires the court to draw inference upon inference upon inference in a way that is just too far a leap to suggest that there was this market-wide conspiracy. Could you respond to the point I raised with opposing counsel? Let's take the example of the Credit Suisse trader, a pal. Just to take the other tack, they allege that he was registered to trade on behalf of the four related Credit Suisse entities. Isn't there a good argument that at least now, at 12B6, that's all they need to allege, and that you can have discovery to see exactly who he was trading for that particular moment in time or who he was acting on behalf of? So even if we think that there's some imprecision in the pleadings right now, or imprecision of detail about exactly which Credit Suisse entity was involved, that's fine, because we'll straighten that out once discovery is completed. Well, the papers on the motion to dismiss include declarations from each of the individual defendants that were named. Going to the personal jurisdiction point, which my colleague, Mr. Januszewski, will address, I think it is very relevant that those traders were employed by foreign defendants. Those were the companies that they were acting on behalf of. They may have had permission to trade for other entities, but they were employed and working on behalf of foreign entities. Those are the only entities on whose behalf they were trading, and that has no connection to any of the domestic dealer defendants in the case. Thank you. Mr. Januszewski? Thank you, Your Honor. May it please the Court, David Januszewski from Cahill Gordon. I represent the Credit Suisse defendants in the case. Today I'm addressing the personal jurisdiction, which relates to all the so-called foreign dealer defendants. The foreign dealer defendants are all incorporated outside the United States. None of them has a principal place of business in the U.S. As Ms. Lent mentioned, there are declarations in the record for all of them, the absence of any real presence in the United States. So there is clearly no general jurisdiction here. I think it's undisputed at this point, although perhaps not early in the case that we're talking only about specific jurisdiction here. As the Supreme Court has made clear many times, most recently in Ford, the issue here then is whether the antitrust conspiracy that they allege, as Ms. Lent has just described it, whether that conspiracy arises out of or relates to the foreign dealer defendants' individual contacts with the forum. As you've heard, the conspiracy alleged here occurred in Europe and Asia. Judge Nardin, by the way, Mr. Powell was employed by Credit Suisse Securities in Europe Ltd. There's a declaration at JA-283, and that Credit Suisse entity has no real presence in the United States, no employees in the U.S., etc. And I believe that's undisputed in the record. So the claims here we submit, Your Honors, is substantially the same as the false submission claims the court addressed in Schwab. Like the foreign banks there who were making LIBOR submissions in London, the guts of the conspiracy here is at the desks in London. Could I just interrupt for a second? Someone is rustling papers in front of a microphone. And just stop. Thank you. Go ahead. So Mr. Brockett's focus has generally been, he didn't address the jurisdiction issue, I don't think, just now, but below and in the briefs has generally been, well, they sold lots of bonds here, billions and billions of bonds. But that's just regular business activity that was being conducted before the alleged conspiracy started and is not tied to the specific allegations supporting the alleged conspiracy. They do point to a few transactions with some of the foreign dealer defendants, one with Barclays, one with Citi. But if you look at those allegations in the complaint, it's paragraphs 52 and 70 in the complaint, it's pure boilerplate. It says that those banks executed trades with the plaintiffs at artificial prices. They don't allege when, they don't allege the price, they don't allege the circumstances, they don't allege how it's tied to the alleged conspiracy, which is required for jurisdiction. At the end of the day, they need to address effects, the effects test, because they're talking about conduct outside the jurisdiction. Supreme Court in Walden, in this court in Walden, make clear that that conduct has to be specifically intentionally directed at the particular forum. Those allegations with respect to the foreign dealer defendants are simply not here. There is the allegation that these are Yankee bonds, so to speak, or at least some of them, not all of them. The complaint is careful to allege some of them are known as Yankee bonds. As Judge Jacobs, I think, mentioned that that refers to the dollar denomination of the bonds. They cite some very raw data from one year that there was a big chunk of the bonds being sold in the US. None of this is sufficient to show the specific focus on the forum that Waldman, where the court was addressing with a terrorist bomb, directed generally and not specifically, or more recently in Schwab, where the court addressed this same issue in the context of California. Yes, it may have been foreseeable that there would be transactions in California if there were going to be transactions in the US, but that's simply not enough. Foreseeability is not enough. Thank you. Mr. Brockett, you have two minutes for rebuttal. Yes, thank you, Your Honor. Just a couple points on personal jurisdiction. First of all, these bonds are issued in US dollars for a reason. They're issued in US dollars because they are specifically intended for the US market. That's why they're called Yankee bonds, and we cite studies in the complaint that indicate that over 75% of these bonds are sold to US customers. Second point, the foreign banks, who are named as defendants here, directly sold these bonds to the named plaintiffs. In addition, they also sold billions and billions and tens of thousands of these bonds to other US investors who are members of the class in this case. Those contacts, that business activity in the US, which is directly tied to the claims, are certainly relevant to jurisdiction under the recent Supreme Court decision in Ford. Now, we back up this allegation with 31 transactions are mentioned in the chats themselves, in which you see the foreign traders and the foreign banks involved in transactions with US entities. One of the main points I want to leave you with on jurisdiction is this, that even where the foreign banks were not the direct counterparty on the trades, and in many of these trades, it was the US affiliate that actually booked the trade, but on every one of these trades, the foreign traders that negotiated the trade, they priced the transaction, and they approved the transaction. All of this business ran through this core group of traders in London who had the power to cancel trades, the power to enter into trades, and who supplied the price for every one of these transactions, knowing that the transaction was going to be executed with a US class member. I see my time's up. Again, I'm happy to answer any questions. Thank you all. The court will reserve decision.